**Affirmed and Memorandum Opinion filed November 9, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-23-00352-CV

---

**J.M., Appellant**

**V.**

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2021-00327J**

---

## MEMORANDUM OPINION

This accelerated appeal arises from a final order in which, after a final hearing tried to the bench,[1] the trial court terminated the parental rights of appellant J.M. (Father) with respect to his daughter L.M. (Lydia),[2] who was seven-years old at the time of trial, and appointed appellee Department of Family

---

[1] We refer to the final hearing as the "trial."

[2] To protect the minor's identity, we have not used the actual names of the child, parents, or other family members. *See* Tex. R. App. P. 9.8.

and Protective Services (the Department) to be Lydia's sole permanent managing conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1) (accelerated appeals in parental-termination cases); Tex. R. App. P. 28.4 (same).

In issue one, Father argues the trial court made errors in ruling on evidentiary objections which precluded Father from receiving a fair and impartial trial. In issue two, Father challenges the sufficiency of the evidence to support the trial court's findings on the predicate ground of constructive abandonment pursuant to subsection N. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N). In issue three, Father challenges the sufficiency of the evidence to support the trial court's rejection of his affirmative defense of good-faith compliance with services plan and the failure of the Department to provide the requisite services. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). In issue four, Father challenges the sufficiency of the evidence to support the trial court's finding that it was in the best interest of Lydia to terminate Father's parental rights. In issue five, Father argues the trial court erred by appointing the Department as the permanent managing conservator.

We affirm.

## I. BACKGROUND

Lydia was born in Ohio in July 2015. Her mother, K.G. (Mother), left Father in 2018 and came to Texas. Father lost all contact with Mother and Lydia when they left Ohio.

The Department received a report in March 2021 that Mother left Lydia with a stranger at a hotel and did not check on her for two days. Mother disputed this characterization when interviewed and explained the person she left Lydia with was a friend. However, the individual who was watching Lydia also alleged that Mother had abandoned Lydia and was using methamphetamine. The Department

2

also received a neglectful supervision referral on the basis that Mother had been staying at a hotel using drugs for several days and had left Lydia with different strangers who were also drug addicts. It was also alleged that Mother had given Lydia excessive melatonin gummies to keep her asleep.

Lydia was five-years old at the time of removal and reported to the CPS investigator that she lived in the hotel with her mother but did not know where her parents were. Lydia was then taken into care by the Department over concerns for her safety.

Father has been a lifelong resident of Ohio. He told the CPS investigator that he had not seen Lydia in at least two years because Mother had taken Lydia and gone to Texas. Father wanted Lydia returned to him in Ohio. Father further stated he was not aware that Mother was using drugs or that Lydia had not been provided routine medical care.

The trial on the termination of Mother's and Father's parental rights began in March 2022 and concluded in March 2023, following which the trial court terminated Mother's and Father's parental rights to Lydia.[3] Father's parental rights were terminated pursuant to Family Code subsections 161.001 (N) and (O). The trial court also found termination was in Lydia's best interest.

## A. Documentary evidence

### 1. Original petition and affidavit

In March 2021, the Department filed its original petition for protection of a child for conservatorship and for termination. The petition was supported by an affidavit from a CPS investigator who interviewed Lydia, Mother, and the

---

[3] Although Mother's parental rights were terminated, she does not appeal from the trial court's final order. Therefore, this opinion considers only the evidence and grounds relating to Father.

individual who called CPS. Although Lydia appeared well-groomed, the Department determined that Mother had left her with other individuals for long periods of time, had not provided Lydia with enough food and tried to keep her asleep by giving her large doses of melatonin. A search of Mother's room found melatonin and drug paraphernalia.

The Department had two previous referrals for Mother and two children in 2020, one of which was addressed before removal was necessary and the other could not be completed as Mother moved and could not be contacted.

The trial court issued emergency orders allowing removal. In May 2021, after an adversary hearing, the trial court issued temporary orders appointing the Department as Lydia's temporary managing conservator.

## 2. Family-plan evaluation

According to the Department's family-plan evaluation (the services plan) first drafted in April 2021, which was admitted into evidence at trial, the goal was to ensure Lydia could grow up in a loving, stable environment free from abuse and neglect.

The plan outlined the required actions for Father including the following:

a. obtain and maintain stable employment (including providing proof of employment to the Department);
b. maintain appropriate housing (including providing proof to the Department);
c. notify the caseworker of any changes to his address or telephone number;
d. successfully complete a 6–8-week parenting class;
e. participate in a psychological assessment and address any emotional or mental needs;
f. complete a trauma-informed training to parent a traumatized child;
g. provide the case worker with information on any household

members or persons who frequent his home; and

h. complete random drug and alcohol testing.

The services plan states that Father does not need "additional supportive services or assistance" to complete the tasks in the services plan.

### 3. Paternity

At trial, Lydia's birth certificate was admitted and the trial court signed an order establishing Father's parentage.

The Department also sought to domesticate and modify an Ohio child-support order, which required Father to make child-support payments of $181.00 per month beginning in July 2017.

### 4. Father's drug-testing history

Father submitted to urinalysis drug screening in July 2021 and September 2021, and he tested positive for marijuana metabolites.[4] Hair follicle screenings were also ordered for July 2021 and September 2021, but could not be performed on either of those occasions because Father did not have enough hair on his body. Father did not submit for testing as ordered in January 2022.

Father did submit to a drug test during trial in 2023, but there is no documentary evidence in the record of his results.

### 5. Child Advocates report

Child Advocates prepared a report in February 2022 describing that Father had participated in two urinalysis tests and attended family visitation before the trial court suspended visitation. Other than those activities, Father had not made progress on his services plan. The report also reflects that Lydia's child advocate

---

[4] Father is a resident of Ohio and provided evidence at trial that he was legally prescribed marijuana for medicinal reasons by a physician in accordance with Ohio law.

attempted unsuccessfully to contact Father five times in May 2021 and June 2021.

In the February 2022 report, Child Advocates recommended terminating Father's parental rights because he had not established that he could provide a safe and stable environment for Lydia.

### 6. Permanency report to the court

The report submitted to the court in February 2022 reflected that Father was in contact with the Department but was not in compliance with most of his required services. The report states Father was given information with a list of providers in his area in November 2021 and December 2021. Father was also requested to provide information needed for a background check in September 2021.

The report also details the visitation history between Father and Lydia. Only three virtual visits occurred, two of which were ended early by Lydia, before visitation was suspended by the court.

## B. Trial testimony

### 1. CPS Supervisor

Child Protective Services (CPS) supervisor G. Robinson testified that she had been assigned to the case since August 2021. The caseworker who was involved early in the case was no longer with the Department. The CPS supervisor testified that Father had spoken with her twice during the pendency of the case. He also consistently expressed that he wanted his daughter returned and that he missed her.

The CPS supervisor spoke with Father in August 2022. He advised that he was having a hard time engaging with the caseworker at the time. He also told the CPS supervisor that he did not know what services he needed to complete, because

his services plan had been thrown out and he did not have a court-ordered service plan. The CPS supervisor followed up with Father and explained the requirements of his services plan.

The CPS supervisor testified that the CPS caseworkers regularly reached out to Father, even after he asked them to stop calling him. She also testified that Father has not provided any resources for Lydia since she has come into the Department's care.

The CPS supervisor testified there was concern that Father was a drug user. She testified there were two urinalysis results from July and September 2021 reflecting that Father had marijuana metabolites in his system. Father did not submit to a hair follicle test because it was alleged that he did not have enough hair on his body to conduct the test. Father was supposed to drug test in January 2022, but did not show up for that test.

Father discussed completing his services with the CPS supervisor. One of his primary issues was the affordability of the classes. The CPS supervisor recalled that some of the classes were free, and others were not. However, Father also lacked transportation to attend classes. The CPS supervisor further testified that the Department could not pay for classes outside of Texas. Father had claimed that he had taken parenting classes six times during his life, but none during the pendency of Lydia's case, which the CPS supervisor flagged as a concern.

Although Father's behaviors were appropriate during his visitation with Lydia, the CPS supervisor reported that Lydia did not engage with Father and sometimes walked away from visitation stating that she did not want to talk. The CPS supervisor testified that Lydia was doing well in her foster placement. She testified that Lydia had progressed because of trust and security with her foster parents and attending therapy. Her interactions with Lydia, Father, and the foster

parents support her opinion that Father has no established parent-child relationship with Lydia.

The CPS supervisor also testified that domestic violence was an issue in the relationship between Mother and Father. Mother had explained that she left Father because of domestic violence. Father, in turn, told the supervisor that Mother was the cause of the domestic violence.

### 2. Clinical therapist

D. Watkins has been Lydia's clinical therapist since June 2022. She works at DePelchin Children's center and visits with Lydia virtually. She has diagnosed Lydia with adjustment disorder with anxiety. She has also seen some indicators of ADHD and has started the process of evaluating Lydia for ADHD.

Lydia has never discussed Mother or Father with Watkins. Lydia redirects the conversation when her parents are brought up. It is Watkins's opinion that Lydia has experienced some trauma, but she does not know what trauma Lydia has experienced.

Watkins has observed Lydia with her foster mother and believes that Lydia is bonded to her foster family. In their sessions, Lydia is generally positive and responsive. Watkins has received reports from the foster family about Lydia's behaviors consistent with her diagnosis of adjustment disorder and anxiety.

Watkins stated that Lydia has made minimal progress processing her past trauma and believes that she will need to continue in therapy. Watkins also stated that changing Lydia's placement may make it more difficult for Lydia to progress psychologically.

### 3. CPS caseworker

CPS caseworker R. Jones has served as Lydia's caseworker since October

8

2022. She has had no contact with Father because he will not take or respond to her telephone calls or texts.

The caseworker visits Lydia each month in her placements. The caseworker has observed that Lydia is very bonded with her foster parents and that Lydia trusts and responds to her foster family. The caseworker further explained that Lydia smiles around her foster family.

The caseworker spoke highly of the parenting abilities of the foster parents, describing the foster parents as loving and organized with all of Lydia's appointments and referrals. The caseworker testified that the foster parents want to adopt Lydia.

### 4. Child Advocate

Child Advocates team leader S. Arredondo testified that she has supervised Lydia's case since January 2022. She spoke with Father once, in the presence of his attorney, and they discussed his services plan. She testified that Father was familiar with the services plan but could not locate free services in his area. Father did not discuss with her any plans he had for Lydia or any services he had identified as available for Lydia.

Arredondo has met with Lydia and built a relationship with her. She described Lydia as being "in the moment." Arredondo stated that she tried to discuss Mother and Father with Lydia, but Lydia would "completely shut down or would completely just change." Based on her observations and interactions, Arredondo believes that Lydia wishes to remain with her current foster family.

Arredondo also testified that Lydia came into care behind in schooling but has made some progress. Arredondo had recently attended a meeting at school at which speech therapy for Lydia was discussed.

## 5. Father

Father has five children other than Lydia. Four of those children have not had any contact with Father for many years. Their mother left Father, and he has not made efforts to find the children or maintain contact with them. The remaining child is a 12-year-old boy who lives with Father. At trial, Father testified that his son is happy and healthy, and they have a good relationship.

Father last saw Lydia in December 2018, when she was just three-years old. Father learned that Mother was living in a tent with Lydia in their hometown and called child protective services in Ohio. He testified that he was told she was "fine and happy." Father subsequently lost track of them and did not make any other efforts to locate Lydia. In 2021 he heard from Mother's son that Lydia was in the custody of the Department.

Father said he failed to complete his services plan because he could not afford the services. Although he admitted receiving a list of services from his caseworker, he testified that they were not free to him because he did not have a case pending in Ohio. Father testified that he spoke with child protective services in Ohio about attending free services, and they declined to provide him with any services. However, his testimony was unclear whether he contacted each of the service providers identified by the Department. Father also confirmed that he did no independent research to find free or affordable services, and he did not look for any online classes. In his testimony, Father explained that he did not believe online classes would be permitted. However, Father did not seek approval for online services after he had trouble getting free in-person classes.

Father did not complete a psychosocial evaluation and denied awareness it was required. Father also denied knowing about many of the requirements of his services plan.

Father had not had full-time permanent employment in several years. He testified that he did private "odd jobs" to make money and earned approximately $150 per week. Although Father owned a car, he did not drive it because his Ohio driver's license was suspended for failure to pay child support. He and his son use taxi services to get around. He claims that his driver's license was suspended because of something the Department did or did not do in trying to domesticate his child support judgment.

Father denied using drugs other than marijuana, which was medicinal and prescribed by a health-care provider in compliance with Ohio law.

Although Father had no concerns for Lydia's current care, he testified that he could give Lydia more love than her foster family. Father testified that he had already identified a school and therapy location for Lydia near his home.

## II.  ANALYSIS

### A.  Standards of review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Given the fundamental liberty interests at stake, "termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

Due to the severity and permanency of terminating the parental relationship,

the law in Texas requires clear-and-convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *See J.F.C.*, 96 S.W.3d at 266–67. We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *Id.* at 266. We must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *Id.* However, this does not compel us to disregard all evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we are also mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

**B.      Predicate termination grounds**

The trial court made predicate termination findings that Father had committed acts establishing the grounds set out in subsections N and O of section 161.001(b)(1), which provides for termination of parental rights if the factfinder finds by clear-and-convincing evidence that the parent has:

>        (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months . . . [or]

>        (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(N), (O).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

**1.  Compliance with services plan**

To terminate parental rights pursuant to subsection O, the Department must show that (1) the child was removed under Family Code chapter 262 for abuse or neglect, (2) the child has been in the managing conservatorship of the Department for at least nine months, and (3) the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(O). Here, Father does not challenge the trial court's finding pursuant to subsection O that he

did not complete all the actions necessary for the return of the child in the services plan.

Instead, in issue three, Father argues that he met his burden to establish, by a preponderance of the evidence, that he attempted to complete his services plan in good faith and that his failure to comply with the services plan was not his fault.[5] Family Code section 161.001(d) establishes a defense to subsection O. *See* Tex. Fam. Code Ann. § 161.001(d). That defense provides that a trial court may not terminate the parent-child relationship under subsection O if the parent proves by a preponderance of the evidence that: (1) the parent was unable to comply with specific provisions of the court order and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent. *Id.* Therefore, Father had the burden to prove his good-faith efforts to comply with the services plan on each specific provision of the services plan with which he was unable to comply or complete.

In the final order of termination, the trial court found that Father failed to raise a defense based on section 161.001(d) and, even if presented, there was no proof by a preponderance of evidence that Father (1) was unable to comply with specific provisions of a court order and (2) made a good-faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of Father.

## 2. Section 161.001(d) defense

In asserting he met his burden of proof under section 161.001(d), Father argues he attended all the permanency court hearings, and he showed up to his

---

[5] Put another way, Father challenges the sufficiency of the evidence to support the trial court's finding that he did not prove by a preponderance of the evidence that he was unable to comply with specific provisions of the services plan and that his failure to comply with the order was not his fault.

drug tests except for one that occurred during a major snowstorm. Father testified he inquired into the list of resources provided by CPS and was told the services would not be free. Father also called his local child protective services agency to see if he could complete services through their programs and was informed that without an open Ohio case, he could not utilize their free services. Father also testified that he was a recipient of public benefits and established that he could not afford services.

However, Father's argument on appeal ignores several requirements with which Father was required to comply and for which Father offered no evidence of any good-faith attempts to comply or justification for lack of compliance: (1) Father did not provide the Department with any proof of his housing, which was required by the services plan; (2) Father offered no evidence of employment or other income/resources to care for Lydia, as required by the services plan; and (3) Father also offered no evidence or explanation of why he was unable to comply with the requirement for hair follicle testing in July 2021 and September 2021. Therefore, Father did not meet his burden to establish good-faith compliance as to the foregoing requirements. We need not consider Father's other arguments, or the State's responses, regarding other services-plan requirements.

We conclude that the evidence supporting the trial court's finding—that Father did not provide proof of his defense to noncompliance with his services plan by a preponderance of the evidence—is legally sufficient and is not factually insufficient. Because Father did not otherwise challenge the legal or factual sufficiency of the evidence supporting the trial court's finding that termination of Father's parental rights was justified under subsection O, we conclude the trial court's final order is supported by at least one predicate termination ground. Therefore, we need not review the sufficiency of the evidence to support the

15

subsection N finding. *See A.V.*, 113 S.W.3d at 362.

We overrule issue three and do not reach issue two.

## C. Best interest of the child

In issue four, Father argues the Department did not produce clear-and-convincing evidence that termination of Father's parental rights was in Lydia's best interest. We construe this issue as a challenge to the legal and factual sufficiency of the evidence to support the trial court's finding that termination of Father's parental rights is in the best interest of Lydia. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

### 1. Legal standard

There is a strong presumption that the best interest of a child is served by keeping the child with a natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)). However, prompt and permanent placement of children in a safe environment is also presumed to be in the children's best interest. Tex. Fam. Code Ann. § 263.307(a). The considerations the factfinder may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing

parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest, we are mindful the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship the children have with the parent. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

### 2. Sufficiency of the evidence

#### a. Desires of the child

Lydia did not testify at trial and, although the record indicates that the trial court consulted Lydia, there is no direct record of Lydia's desires.

According to her child advocate, Lydia has no bond with Father and wishes to remain with her foster family. The child advocate further stated that Lydia had issues with security and was reportedly afraid of being left or abandoned.

The CPS supervisor also stated that Father had no bond with Lydia and there was some evidence that she did not know who Father was. In response, Father argued that Mother removed Lydia from his care when she was very little and that the Department had not given him the opportunity to rebuild a relationship with her.

Taking the evidence into consideration, Lydia's desire to stay with her foster

17

family, maintain the bonds she has built with them, and her need for stability weigh in favor of termination.

### b.    Physical and emotional needs of the child

Although there was extensive testimony from the CPS supervisor and child advocate regarding Lydia's fragile emotional and physical state when she came into the care of the Department, Father had not been involved in her life for at least two and half years at that point.

Trial testimony established that Lydia was progressing well with her current foster family. She had caught up on her medical and dental care and had made progress in school. Lydia's clinical therapist had testified that Lydia was still affected by traumas that she could not discuss or confront. Therefore, her recommendation was that Lydia continue with therapy and remain in a supportive, stable environment.

It was clear from the testimony at trial that Lydia's foster family can address her needs. Father also testified that he could provide a stable, loving environment with access to therapy and a good education. Father is currently the sole caregiver for his older son. However, given Lydia's physical and emotional needs, we conclude this factor weighs in favor of termination.

### c.    Physical and emotional danger to the child

There was testimony at trial from Lydia's therapist and child advocate reflecting that stability was important for Lydia's psychological and emotional development and that moving her could cause a regression. There was also evidence at trial from both Father and the CPS supervisor that Lydia had no bond with Father given her age when she left his home and the length of time she had been away from him. Therefore, placing Lydia with Father would create

psychological and emotional upheaval for Lydia as Father is not a familiar caregiver for her.

Although Father testified that he could provide a stable environment for Lydia, Father did not offer any proof—as required by his services plan—for his claims that he had steady income and stable housing. Father's acrimonious interactions with the Department prevented any meaningful assessment of his home as a potential placement.

Further, the CPS supervisor raised concerns that Father might have taken part in the trauma experienced by Lydia. Father told the CPS supervisor that his relationship with Mother involved domestic violence. Mother told the CPS supervisor that she left Father because of his violence against her.

In consideration of the evidence presented at trial, this factor weighs in favor of termination representing the best interests of the child.

### d.    Parenting abilities and available programs

Father's parenting abilities were unclear from the trial testimony. Although he was the primary caregiver for his son, there was evidence at trial that Ohio child protective services received several referrals based on suspected neglect or abuse. Although abuse and neglect were ultimately ruled out after an investigation, information provided in the referrals reflected that Father lived with his mother until her death in 2023 and that she assisted in caring for her grandson.

At trial, Father was very terse in his testimony and offered little insight into his parenting abilities or resources to provide for a second child. He was also unemployed and supplemented his income with part-time jobs. However, it was unclear whether Father intended to secure full-time employment and how he intended to meet Lydia's needs.

19

Given the lack of evidence in the record on this issue, we conclude this factor is weighs in favor of the trial court's finding that termination was in Lydia's best interest.

### e. Plans for Lydia and stability of the proposed placement

Lydia's foster family offered a stable, loving environment that would meet her needs. The foster family also sought to adopt Lydia if Father's rights were terminated.

Father similarly urged that he could offer stability for Lydia in his home and with her brother. At trial, Father articulated some plans for Lydia explaining that she could attend the same school his son attended and that he had identified a center that could provide therapy to her. However, Father never communicated any of his plans to the Department before trial and offered no documentation to back up his claims.

We conclude this factor is, at best, neutral as to termination.

### f. Acts or omissions of the parent

Although Father was appropriate in the two virtual visits he had with Lydia, Father had not been part of Lydia's life in some time. There was evidence that Mother left Father and took Lydia out of the state to get away his violent tendencies. It is also probative Father did not make any efforts to locate or seek Lydia's return.

Father's behavior during the pendency of the termination case is also concerning. Although he felt as if the Department never properly considered returning Lydia to his care and custody, he did not make much effort to complete the services plan. Father did attend all court hearings and appeared for nearly all the court-ordered drug tests. However, Father did little else to complete his

services plan. He made no attempts to provide the Department with proof of housing or employment (financial resources) as required by his services plan, nor did he offer any justification for his inability to complete a hair follicle test as ordered by the trial court in July 2021 and August 2021.

Considering the evidence introduced at trial, this factor weighs in favor of the trial court's finding that termination was in Lydia's best interest.

### g.   Analysis

The evidence at trial supports the trial court's finding that termination of Father's parental rights is in Lydia best interest, including the evidence of the stability and permanency of a placement with the foster family, Father's lack of connection with Lydia, Father's lack of compliance with the services plan, Father's history of family violence with Mother, and the comparative dearth of evidence regarding Father's resources and plans for taking care of Lydia. *See In re L.M.*, 572 S.W.3d 823, 838 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("[T]he trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in the child's best interest so that she could promptly achieve permanency through adoption."). Father argues that the Department did not give him an opportunity to rebuild his relationship with Lydia and argues that her behavior during the two visits was consistent with a child who had underdeveloped social skills and mood dysregulation. Father does not address the testimony that Lydia appeared very uncomfortable during visits, and on one occasion said she did not want to chat and displayed behavioral issues before and after visits.

Our review of the *Holley* factors indicates the trial court's finding, by clear-and-convincing evidence, that termination of Father's parental rights is in Lydia's best interest is supported by legally-sufficient evidence and evidence that

is not factually insufficient. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72.

We overrule issue four.

## D.    Conservatorship

In issue five, Father challenges the trial court's appointment of the Department as Lydia's permanent managing conservator. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, a respondent challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). The trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Having concluded the evidence is sufficient to support the termination of Father's parental rights, we conclude the trial court had sufficient information on which to exercise its discretion and did not abuse its discretion in appointing the Department as sole

managing conservator of Lydia. *See L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding in which evidence was sufficient to support termination of parental rights). We overrule issue five.

## E.      Evidentiary rulings

Father argues the trial court erred by (1) improperly admitting expert testimony without notice to Father and (2) improperly excluding hearing transcripts reflecting that an employee of the Department made inconsistent statements.

### 1.  Expert testimony

The Department offered the testimony of Watkins, Lydia's treating therapist, at trial. Several minutes into her testimony, Father objected to any testimony that she might offer as an expert witness because the Department had not designated her as an expert witness. The Department took the position Watkins was not an expert and was just giving testimony as "the therapist for [Lydia]." The trial court allowed Watkins to testify without limitation.

Father objected to the expert testimony on the basis that the Department did not comply with the requirements of Rule 195.5, which requires a party to provide certain information about an expert witness 90 days before the end of discovery. Tex. R. Civ. P. 195.2, 195.5. We review a trial court's evidentiary rulings under an abuse of discretion standard. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

A person with specialized knowledge may testify about his or her own observations under Rule 701 of the Rules of Evidence and may also testify about the theories, facts, and data used in his or her area of expertise under Rule 702. Tex. R. Evid. 701, 702. A licensed, clinical therapist can testify both to her

23

personal observations, as well as to her opinion formed on the basis of her training and expertise. *See Rogers v. Department of Family & Protective Services*, 175 S.W.3d 370, 377 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (discussing social worker). However, consistent with its statement that it did not intend to offer Watkins as an expert, the Department did not properly prove up Watkins as an expert. Watkins testified that she was employed by DePelchin Children's Center and had worked as a clinical therapist for 18 years. However, there is nothing in the record on her education, training, or qualifications.

Even though the State did not disclose Watkins as an expert or prove up her qualifications as an expert, the State elicited testimony from Watkins that drew on her education, training, and expertise and was outside the province of a lay witness. Therefore, the trial court abused its discretion in permitting Watkins to offer expert opinions because they were not timely disclosed and because the expert had not been properly qualified.

At trial, Father did not categorically object to all testimony provided by Watkins. Rather, he objected to those portions of Watkins's testimony that he believed constituted expert opinions about Lydia's diagnoses or progress. Therefore, we must address whether the trial court's error probably caused the rendition of an improper judgment or prevented Father from properly presenting his case on appeal. *See* Tex. R. App. P. 44.1(a).

The expert testimony that Father objected to related to Lydia's mental health diagnosis, her proposed treatment, as well as to her progress in treatment. These topics required specialized knowledge and were outside the general understanding of a lay witness. *See* Tex. R. Evid. 702. However, none of this testimony bears on whether Father constructively abandoned Lydia or did not complete his services plan. In his appellate briefing, Father argues that Watkins's testimony addressed

24

the best interests of the child—specifically Lydia's psychological and emotional needs. Therefore, Father argues that Watkins was the only witness who offered insight into Lydia's "psychological well-being, diagnosis, and continuing needs." However, Father's argument overlooks testimony from the CPS Supervisor that reflects Lydia was in therapy and was progressing well with her therapy.

The testimony offered by Watkins that bears directly on the termination inquiry (as there was testimony that Lydia could continue to receive therapy if she was placed with Father and irrespective of her current placement) is testimony that changing Lydia's routines, living situation and family composition would interfere with progress she has made and interfere with her ability to address past traumas. However, Lydia's psychological well-being and progress in therapy is one piece of the best-interests analysis. If we remove from consideration the testimony about Lydia's diagnosis, treatment plan and progress; there is still sufficient evidence supporting the trial court's finding that termination was in Lydia's best interest and the trial court's error was harmless. *See In re E.A.G.*, 373 S.W.3d 129, 145 (Tex. App.—San Antonio 2012, pet. denied) (trial court's erroneous evidentiary rulings were harmless).

### 2. Hearing testimony transcripts

Father argues that the trial court improperly refused to admit three transcripts from permanency hearings in the case at which a caseworker, no longer employed by the Department, testified. At trial, Father explained that he sought the admission of the three hearing transcripts to impeach the CPS supervisor with statements made by a previous caseworker. *See* Tex. R. Evid. 607 (impeachment attacks credibility of witness). On appeal, Father argues that he should have been allowed to admit the hearing transcripts because both the CPS supervisor and

caseworker had testified as the Department's corporate representative.[6]

However, Father did not lay the foundation to establish that the previous caseworker had testified as the corporate representative of the Department—as opposed to a fact witness with personal knowledge—and did not raise his request with sufficient specificity to make the trial court aware of the specific grounds on which he sought admission. The record reflects the trial court understood Father to be requesting admission of testimony from a witness who was not available to testify and without any predicate as to whether any efforts were made to secure the caseworker's attendance at trial. *See* Tex. R. Evid. 804. Therefore, we conclude this specific complaint was not preserved for appellate review. Tex. R. App. P. 33.1(a).

We overrule issue one.

### III.   CONCLUSION

We affirm the trial court's final order as challenged on appeal.

/s/     Charles A. Spain
Justice

Panel consists of Justices Jewell, Spain, and Wilson.

---

[6] Father was able to examine the CPS Supervisor regarding the statements made by the previous casework.

26